UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARPENTERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>KEITH WALKER, et al.,<br><br>Defendants. | Case No. 12-cv-01447-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 85 |

After I granted plaintiff Carpenters Pension Trust Fund for Northern California's (the "Pension Fund") motion for summary judgment against defendants Keith Walker, the Keith Walker Trust dated March 17, 1999, the Keith Walker Trust dated May 17, 1999, and the Real Estate Leasing Business operated by the Keith Walker Trust, the Pension Fund amended its complaint to add defendants K&M Industries, Inc. ("K&M") and D&B Engineered Applications, Inc. ("D&B"). The sole issue in this case is whether these two companies are "trades or businesses" so as to render them control group members pursuant to 29 U.S.C. § 1301(b)(1). The undisputed facts prove that both K&M and D&B have an economic nexus to the operations of RFI and the control group, and that both have operated as income-generating businesses during the relevant time period. Because this establishes that they were "trades or businesses" under section 1301(b), I GRANT the Pension Fund's motion for summary judgment.

## BACKGROUND

As I discussed in the April 17, 2014 order, there are no material undisputed facts in this case. *See* Order at 1 (Dkt. No. 75). The Pension Fund is an employee benefit plan and a multiemployer plan as defined by the Employment Retirement Income Security Act of 1974 ("ERISA"). *Id.* Walker, the Keith Walker Trusts, and the Real Estate Leasing Business are all part of a control group that incurred withdrawal liability under ERISA, 29 U.S.C. § 1361 *et seq.*,

when Walker's business Rollie French, Inc. ("RFI") terminated a collective bargaining agreement with the Pension Fund. *Id.* at 2, 7-8. RFI worked in the building and construction industry, and performed metal stud framing, lathing, plastering, and drywall installation. Walker Depo. 1 at 11 (Dkt. No. 49-1); Dkt. No. 51 at 3.

I granted the Pension Fund's first motion for summary judgment on the basis that RFI, the Keith Walker Trusts, and the Real Estate Leasing Business were under common control and were therefore jointly and severally liable for RFI's withdrawal liability under ERISA. Order at 8. Because the Pension Fund intended to pursue similar claims against K&M and D&B, I granted it leave to amend. *Id.* at 9. The Pension Fund subsequently filed an amended complaint and a second motion for summary judgment. *See* FAC (Dkt. No. 76); Mot. (Dkt. No. 85). I heard argument on January 14, 2015. Dkt. No. 89.

Walker was in sole control of both K&M and D&B at the time of his withdrawal from the Pension Fund in 2008. Order at 2. Neither party disputes this fact. *See* Mot. at 3 (Dkt. No. 85); Oppo. at 1-2 (Dkt. No. 87). Therefore, the only issue in this case is whether K&M and D&B are "trades or businesses" so as to render them jointly and severally liable for RFI's withdrawal liability with the other members of the control group. K&M is currently owned by Walker, and D&B is owned by Cristina Mejia. *See* Walker Depo. 1 at 43, 47. Mejia did the bookkeeping for K&M, D&B, All American Scaffold ("AAS"), and RFI, and currently owns both AAS and D&B. Eckley Depo. at 5 (Dkt. No. 54); Mejia Depo. at 9-13. (Dkt. No. 53-2). She also appears to be Walker's personal bookkeeper. Eckley Depo. at 10-11.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In order to prevail, a party moving for summary judgment must show that there are no genuine issues of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the movant has made this showing, the burden shifts to the party opposing summary judgment to identify "specific facts

1  showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations and citations
2  omitted). The party opposing summary judgment must then present affirmative evidence from
3  which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242,
4  257 (1986).

5  In resolving a summary judgment motion, the Court draws all reasonable factual inferences
6  in favor of the non-movant. *Id.* at 255. "Credibility determinations, the weighing of the evidence,
7  and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."
8  *Id.* (internal quotations and citations omitted). However, conclusory and speculative testimony
9  does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill*
10 *Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Pension plans, including those like the Pension Fund here, are federally regulated pursuant to ERISA, 29 U.S.C. § 1001 *et seq*. The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1453, amended ERISA "to allow plans to impose proportional liability on withdrawing employers for the unfunded vested benefit obligations of multiemployer plans." *Carpenters Pension Trust Fund v. Underground Constr. Co.*, 31 F.3d 776, 778 (9th Cir. 1994). "Prior to the enactment of the MPPAA, employers could withdraw from pension plans without paying their share of the plans' unfunded vested benefit liability." *Woodward Sand Co., Inc. v. W. Conf. Teamsters Pension Trust Fund*, 789 F.2d 691, 694 (9th Cir. 1986) (internal quotations and citations omitted). In ceasing to make pension contributions, employers could "avoid any responsibility for the actual, but unfunded, liabilities of the plans." *Id*. "The other employers remaining in the plan were forced either to assume these additional liabilities or to withdraw, resulting in unfairness to the remaining employers or insolvency of the plan." *Id*.

"To alleviate these problems, Congress established a system for computing and assessing the liability of employers who withdraw from pension plans." *Id*. This system makes employers pay "their share of the real cost of pensions, by paying a share of the difference between the assets already contributed and the vested benefit liability." *Id*. "This 'withdrawal liability' is assessed against the employer to ensure that employees and their beneficiaries [are not] deprived of

anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Id*. (internal quotations and citations omitted). Given the remedial purposes of ERISA and the MPPAA, their provisions should be liberally construed to protect plan participants. *See Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 175 (3d Cir. 2002); *Teamsters Pension Trust Fund–Bd. of Trs. of W. Conference v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th Cir. 1987).

ERISA's definition of an "employer" encompasses an entity making contributions to a pension plan, and all "trades and businesses" that are under "common control" along with that entity. 29 U.S.C.A. § 1301(b)(1). Each member of a control group is jointly and severally liable for withdrawal liability generated by any member's activities. *See,* e.g., *Bd. of Trustees of W. Teamsters Pension Trust Fund v. LaFrenz*, 837 F.2d 892, 893 (9th Cir. 1988). Common control is defined in 26 C.F.R. §§ 1.414(c)-2 and 1.414(c)-4. This requires that (i) the same group of people or organizations own a controlling interest in each business alleged to be under common control, and (ii) the same group of people or organizations are in effective control of each business alleged to be under common control. 26 C.F.R. §§ 1.414(c)-2(a), (c); Order at 7.

As I recognized in *Tractor Equipment Sales*, ERISA does not define the term "trade or business." *Tractor Equip. Sales*, 2014 WL 5810097, at *7. Some circuits have adopted the test for "trade or business" under sections 62(1) and 162(a) of the Internal Revenue Code. *See* e.g., *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895 (7th Cir. 2001); *Connors v. Incoal, Inc.*, 995 F.2d 245, 251 (D.C. Cir.1993). This was defined by the Supreme Court in *C.I.R. v. Groetzinger* as an "activity with continuity and regularity" for the primary purpose of income or profit. 480 U.S. 23, 35 (1987). However, the Ninth Circuit has not adopted this test, and has stated that the inquiry into whether an activity qualifies as a trade or business is an "essentially factual inquiry." *Lafrenz*, 837 F.2d at 894 n.6. In *Lafrenz*, the leading Ninth Circuit case on this point, the court held that an employer's business of leasing out two Mack trucks was a "trade or business," even though the company did not have any employees, because the defendants "own[ed] the trucks, arranged for the truck leases and admittedly leased the trucks for profit." *Id.* at 893-95.

4

In *Tractor Equipment Sales*, I elaborated upon the inquiry of whether an entity is a trade or business:

> *Lafrenz* and [*Carpenters Pension Trust Fund for Northern California v.*] *Lindquist* provide a basic framework for making section 1301(b)(1) determinations within the Ninth Circuit: It is an essentially factual inquiry. In making this inquiry, courts look to Congress's purpose in enacting section 1301(b)(1): to prevent the controlling group . . . from avoiding withdrawal liability by shifting corporate assets into other business ventures under its control. [P]roperty leases between two commonly-controlled entities . . . constitute a trade or business. But the mere ownership of property, without more, is insufficient to trigger controlled group liability under section 1301(b).

2014 WL 5810097, at *10 (internal quotations and citations omitted). Because of this concern about employers "fractionalizing operations into many separate entities," *see Allyn Transp. Co.*, 832 F.2d at 507, an economic nexus between a business and the employer heightens the concerns that Congress intended to address in enacting section 1301(b)(1). *Tractor Equipment Sales*, 2014 WL 5810097, at *11-12. Therefore, where there is an economic relationship between a business and the withdrawing employer, the business is more likely to be a "trade or business." *Id.* at *12.

## I. THE DEFENDANTS' FAILURE TO INVOKE ERISA'S ARBITRATION PROCEDURES DOES NOT BAR THEIR ARGUMENT THAT K&M AND D&B ARE NOT "TRADES OR BUSINESSES"

The plaintiff argues that the defendants waived all defenses to withdrawal liability by failing to seek arbitration as required by ERISA. Mot. at 2. I recently addressed this issue in *Tractor Equipment Sales*. 2014 WL 5810097 at *6-7, holding that a party's failure to comply with ERISA's arbitration requirements did not prevent it from challenging control group liability. *Id.* This is because control group liability, governed by 29 U.S.C. § 1301(b)(1), is not an "enumerated statutory provision" required by 29 U.S.C. § 1401(a)(1) to be arbitrated. *Id.* Therefore, the defendants' failure to seek arbitration does not prevent them from bringing the present challenge on the basis of control group liability.

## II. K&M IS A "TRADE OR BUSINESS" WITHIN THE MEANING OF 29 U.S.C.A. § 1301(B)(1)

Walker owns K&M, in which he has held a 100% interest since the early 2000s. Walker Depo. 1 at 43-45. He testified that K&M is "[b]asically nothing now. It's a corporation that I had

5

years ago . . . we basically ended up doing nothing. So it just sits there." *Id.* at 43. However, the undisputed evidence indicates otherwise.

K&M is a formally incorporated business, and is by Walker's own admission "an active company right now." Walker Depo. 2 at 20 (Dkt. No. 50); Eckley Depo. at 9. Although it never had any employees or owned any property, *see* Walker Depo. 1 at 52, it owns assets in the form of three or four flatbed trucks, and around one thousand pieces of scaffolding. Walker Depo. 2 at 16. Since before 2006, K&M has leased out this equipment, primarily to AAS, a scaffolding company that also has leased from RFI. Walker Depo. 1 at 53, 59-60; Walker Depo. 2 at 14-15. K&M leased to AAS on a yearly basis and for a fixed value. Walker Depo. 2 at 15. In 2007, it received around $173,000 for rental of equipment. Walker Depo. 1 at 58. It received $252,096 in 2008. *Id.* at 59. K&M received $112,000 from AAS in 2009, although it reported a loss of $49,607 in its 2009 Schedule E. *Id.* at 64; Walker Depo. 2 at 25. It received $101,820 from AAS in 2011 and $280,115 in 2012. Walker Depo. 2 at 25. K&M's income was used to pay bills and other expenses. *Id.* at 22.

Maurice J. Eckley, Walker's accountant, testified that he works on K&M's accounting. Eckley Depo. at 4. He understands K&M to be a company that "basically owns scaffolding equipment, and then they rent and lease that equipment out to primarily one other entity called All American Scaffold. *Id.* at 3.

According to Walker, K&M took over a lease and possibly equipment from RFI. Walker Depo. 1 at 61-62. K&M stored its equipment in the same location as RFI. *Id.* at 64. K&M currently operates in the same building as AAS, which is owned by Walker and at one point housed RFI. *See id.* at 16; Walker Depo. 2 at 23. It receives mail at an address in Los Altos shared with AAS. Walker Depo. 2 at 30-31. Eckley identified Mejia as K&M's accountant. Eckley Depo. at 5, 10.

The undisputed evidence indicates that K&M is an active corporation that has continually rented out equipment since at least 2006. Thus, it was operating as such at the time RFI incurred withdrawal liability. Just as in *Lafrenz*, the activity of leasing out trucks constitutes a business operation under section 1301(b)(1). In addition, there is an economic nexus between the control

6

group, consisting of RFI and the other entities, and K&M. K&M leased out equipment to AAS, who also did business with RFI. Like RFI, K&M was engaged in the construction industry, and it may even have obtained its assets from RFI. K&M operates from the same property that was used by RFI and is owned by the control group members. The relationship between the control group and K&M's activities clearly raises ERISA's concerns about the "shifting [of] corporate assets into other business ventures under" the control of a withdrawing employer. *Tractor Equipment Sales*, 2014 WL 5810097, at *10. For all of these reasons, AAS qualifies as a "trade or business" pursuant to 29 U.S.C.A. § 1301(b)(1).

### III. D&B IS A "TRADE OR BUSINESS" WITHIN THE MEANING OF 29 U.S.C.A. § 1301(B)(1)

Walker owned D&B between 1990 and 2011, and had a 100% interest in it from 2001 to 2011. Walker Depo. 1 at 46-47; Walker Depo. 2 at 7. According to Walker, D&B used to make glass-reinforced gypsum in the late 1980s to early 1990s. Walker Depo. 1 at 46, 52. This was used in drywall installations, columns, and cornices. *Id.* at 46. However, D&B stopped making gypsum before Walker obtained a 100% interest in the company. Walker Depo. 1 at 47-48; Walker Depo. 2 at 7.

Walker testified that between 2001 and 2011 D&B did not do business, complete jobs, or have clients, but that he "just kept the corporation." Walker Depo 2 at 7-8. He also stated that D&B had some assets in the form of trucks and machinery. Walker Depo. 1 at 63-64. D&B stored this equipment in the same location as RFI. *Id.* at 64.

D&B reported $88,884 in ordinary business income in 2008. *Id.* at 63. Walker did not know where any of this income came from. Walker Depo. 2 at 8. The company reported an ordinary income profit of $1,786 in 2009, an income of $67,612 in 2010, and an income of $672 in 2011. Walker Depo. 1 at 64-66. It had an accountant to do books and to pay taxes and other expenses. Walker Depo. 2 at 10. A "general ledger history" from 2008-2011 lists a number of billings with monthly credits of between $10,000 and $50,000 in credits. Dkt. No. 61 at 8-9.

Walker "more or less gave" D&B to Mejia for no consideration in 2011. Walker Depo. 1 at 47-48, 50. According to Mejia, she had been doing "some payables" free of charge for the

1  company and she asked if she could have it. Mejia Depo. at 12. At the time Walker conveyed
2  D&B to Mejia, D&B did not lease space and did not operate from any location. Walker Depo. 1
3  at 50. D&B requires a contractors' license to operate, and Mejia had to obtain such a license
4  before taking over the company. *Id.* at 49.

5  After Mejia acquired D&B in 2011, its operations changed. The evidence indicates that for
6  the years 2011-2013, a number of employees filed W-2 forms with D&B as an employer. Walker
7  Depo. 1 at 69-70; Dkt. No. 61 at 4-7; Dkt. No. 58 at 35-43. Throughout each of those years, D&B
8  wrote a number of company checks each month. Dkt. No. 60 at 1-42; Dkt. No. 59 at 1-22. D&B
9  filed tax returns in 2012 and 2013, and a schedule K in 2012. Dkt. No. 58 at 44-61; Dkt. No. 60 at
10 56-61; Dkt. No. 60-1 at 2-18.

11 Mejia currently owns and is the president of AAS. Mejia Depo. at 8-10. Since 2011, she
12 ran her payroll for AAS through D&B. *Id.* at 17; Walker Depo. 2 at 27; Eckley Depo. at 6. This
13 involved paying money to K&M as an intermediary, who then paid to D&B. Mejia Depo. at 23.
14 A number of checks paid between AAS, K&M, and D&B reflect this pass-through between 2009
15 and 2013. Dkt. No. 61-7 at 2-3, 4-6; Walker Depo. 1 at 70-71.

16 An initial question is the relevant time frame in which to examine D&B's activities. Much
17 of the plaintiff's evidence of D&B's activities relates to activities that occurred after Walker
18 withdrew from the plan, and after Walker conveyed D&B to Mejia. Although the plaintiff stresses
19 the payment scheme whereby D&B paid employees of AAS, *see* Mot. at 4-5, this took place
20 between 2011 and 2013, after Mejia bought the company from Walker and after the withdrawal
21 from the Pension Fund.

22 As defendants' counsel conceded at oral argument, withdrawal liability focuses on the
23 activities of potential control group members primarily at the time of an employer's withdrawal
24 from a pension plan. *See,* e.g., *Teamsters Pension Trust Fund of Philadelphia v. Brigadier*
25 *Leasing Associates*, 880 F. Supp. 388, 396 (E.D. Pa. 1995) ("liability attaches only to trades or
26 businesses that are part of the controlled group at the time of withdrawal"); *Bd. of Trustees of*
27 *Trucking Employees of N. Jersey Welfare Fund, Inc. - Pension Fund v. Centra*, 983 F.2d 495, 502
28 (3d Cir. 1992) ("ERISA defines an employer to include businesses under 'common control' with

8

the actual employer on the withdrawal date."); *Pac. Coast Shipyards Pension Fund v. Nautical Eng'g, Inc.*, No. 12-05439 RS, 2014 WL 120637, at *2 (N.D. Cal. Jan. 13, 2014) (focusing on common control at the time withdrawal liability arose). Although some courts have found that post-withdrawal activity is potentially relevant, *see Cent. States, Se. & Sw. Pension Fund v. Pers., Inc.*, 974 F.2d 789, 795 (7th Cir. 1992), *and Gov't Dev. Bank for Puerto Rico v. Holt Marine Terminal, Inc.*, No. CIV.A. 02-7825, 2004 WL 2062542, at *5 n.5 (E.D. Pa. Sept. 14, 2004), here D&B ceased to be under Walker's control, reducing the materiality of D&B's post-2011 activities.

Given that the focus is on the time of withdrawal, I find that D&B, like K&M, was a trade or business within the definition of section 1301(b)(1). D&B generated income between 2008 and 2009, and it received income credit from several sources. It had an accountant who did bookkeeping and paid taxes and other expenses. *See Connors*, 995 F.2d at 254 ("A defendant's stated declaration that she or he did not intend to engage in a trade or business, without more, is hardly probative of whether an enterprise constitutes a 'trade or business.' A party must point to objective evidence demonstrating that he or she did not intend to create a business."); *Fulkerson*, 238 F.3d at 895 ("Section 1301(b)(1) presents no interpretive difficulties when it is used to impute withdrawal liability to another corporation or other formally recognized business organization that is under common control with the obligated entity."). Considering Walker's use of the Trusts, the Real Estate Leasing Fund, and K&M as apparent vehicles by which Walker shifted the corporate assets of RFI, as well as the fact that D&B's assets consisted of trucks and machinery that were stored in the same location as RFI, there is a sufficient economic nexus to trigger the heightened concern that Walker could "shirk[] [his] ERISA obligations by fractionalizing operations into many separate entities." *Bd. of Trustees of W. Conference of Teamsters Pension Trust Fund v. H.F. Johnson Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987). For these reasons, D&B is a "trade or business" under section 1301(b)(1) and is jointly and severally liable for RFI's withdrawal liability along with the other members of the control group.

**CONCLUSION**

The Pension Fund's motion for summary judgment is GRANTED against defendants K&M and D&B.

**IT IS SO ORDERED**.

Dated: January 15, 2015



WILLIAM H. ORRICK
United States District Judge